IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

AMERICAN SEATING COMPANY,

Plaintiff,

v.

ARCHER PLASTICS INC.,

Defendant.

Civil No. 11-53 (JS)

## MEMORANDUM OPINION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Memorandum Opinion with findings of fact and conclusions of law will serve as the Court's decision with regard to the non-jury trial of this matter that was held on December 9, 2013, January 17, 2014, and February 21, 2014. Pursuant to 28 U.S.C. §636(c), the parties consented to the jurisdiction of this Court to hear this matter. [Doc. No. 73]. Jurisdiction is based on diversity of citizenship. For the reasons to be discussed, the Court will enter Judgment in plaintiff's favor in the amount of $151,109.90, plus prejudgment interest running from January 5, 2011.

The basic facts and background of the case are straightforward. Defendant entered into separate contracts with plaintiff to purchase and remove seats from the Camden Yards ("CY") Baseball Stadium in Baltimore, Maryland, and Foley Field

at the University of Georgia. After plaintiff paid for and removed a substantial number of seats from CY, it informed plaintiff it could not afford to pay for and remove the remaining seats at CY, and none of the seats at Foley Field. Plaintiff then sold the remaining seats and thereafter sued defendant for damages. As to CY, up until the very end of the trial plaintiff pursued a common law breach of contract claim. At the tail end of the trial plaintiff changed course and is now pursuing damages under the Uniform Commercial Code ("UCC").

At trial plaintiff presented the testimony of Mr. Bruce Weener, an employee of American Seating Company for 27 years who is currently its Vice President of Customer Satisfaction. At the time of the contracts at issue Weener was employed as plaintiff's Vice President of Project Management. Plaintiff also called as an adverse or hostile witness Mr. Steven Archer ("Archer"), President of defendant Archer Plastics, Inc. Defendant presented the testimony of Archer.

Viewing the record in totality, at bottom what happened here is that defendant entered into two bad contracts. Unfortunately for defendant, it was not as successful as it hoped for in selling CY seats. As a result, defendant did not have money to pay for the Phase 2 seats which left it no alternative but to repudiate the remaining work it contracted to perform at CY and Foley Field. This situation was not totally

2

within defendant's control, however. It is no secret that the general economic climate and memorabilia market collapsed at or about the time of defendant's contracts. These developments, however, are no defense to plaintiff's right to recover damages on account of defendant's contract breaches.

FINDINGS OF FACT

On January 5, 2011, plaintiff filed this breach of contract lawsuit. Plaintiff American Seating Company designs and builds seating and office furniture for, among others, educational institutions, government entities, corporations and individuals. See Joint Final Pretrial Order, Stipulated Fact 1, Doc. No. 63. Plaintiff sells seats in the office, auditorium and classroom markets, as well as transportation seating and seating in the sports entertainment market. Trial Transcript ("Tr.") 21:20-25(1).[1] Although on occasion plaintiff has sold used seats, it has only done this sporadically. The Court finds that the focus of plaintiff's business and the majority of its sales involves new seats. Plaintiff is plainly not in the business of selling the quantity of used seats that remained at CY after plaintiff breached its contract. Tr. 25:21 to 26:9(1); 32:7-11(1). Defendant's main business is setting up memorabilia sales for sports teams, which includes sales of used seating. Defendant

---

[1] Unfortunately, the pages of the trial transcript are not consecutively numbered. The number in parenthesis refers to the date of the referenced testimony: (1) December, 9, 2013, (2) January 17, 2014, and (3) February 21, 2014.

also sells used stadium seating and related memorabilia. Tr. 156:20 to 157:6(1).

In or about the early summer of 2009 (Tr. 45:6-10(1)), the Maryland Stadium Authority contracted with Gilbane to reseat CY and to do concrete work at the stadium. Tr. 26:15 to 27:13(1). Plaintiff was a subcontractor to Gilbane and its role was to remove all the seats and to install new seats. Tr. 27:21-22(1). When plaintiff made its proposal to Gilbane, it took into account the price defendant agreed to pay plaintiff for the CY seats. Tr. 45:3-22(1). The actual disassembly of the CY seats was done by Harriott Contracting (Tr. 28:19-23(1)), a subcontractor to plaintiff. Tr. 29:1(1). Harriott charged plaintiff $6.50 per chair for removal. Tr. 30:24 to 31:1(1). The reseating work took place from the fall of 2009 through the spring of 2011. Tr. 28:1-4(1). In January 2010, plaintiff contracted to install new benches and seats at Foley Field. Exh. N.

In order to install new seats at CY the old seats obviously had to be removed.  As noted, plaintiff contracted with Harriott to disassemble and box the seats that had to be removed at CY. Defendant came into the picture when it contracted in November 2009 to pay plaintiff a set price per seat to purchase and cart away the CY seats. Defendant intended to resell the seats at a profit. Since plaintiff was responsible for removing the CY

4

seats, plaintiff viewed defendant's contract as profit. In other words, not only was plaintiff going to be paid to remove CY seats, but it was going to earn income by selling the seats it contracted to remove.

On July 18, 2012 [Doc. No. 35], the Honorable Robert B. Kugler entered summary judgment in plaintiff's favor. Judge Kugler ruled that after the exchange of two proposals in October 2009 (see Exh. C, G), plaintiff and defendant contracted for defendant to remove all the seats at CY. The contract is memorialized in a November 5, 2009 purchase order (Exh. K) which provided that defendant would pay plaintiff $8.50 per seat and $18.18 per logo end removed. Opinion at 5-6. The purchase order was emailed by defendant to plaintiff on November 19, 2010. Exh. J. The purchase order called for the removal of an estimated 45,000 stadium seats and 5,500 logo ends for a total contract price of $482,500. Judge Kugler's Opinion noted that the parties' contract language strongly suggested that the final contract price was to be adjusted based on the final seat count at CY. Id. at 8-9.[2]

As to Foley Field, on January 19, 2010 defendant sent a letter to plaintiff agreeing to remove the seats at no cost to plaintiff. Exh. N. In exchange defendant could keep the seats

---

[2] Although a total of 48,876 seats and 5,600 logo ends were removed from CY (Tr. 111:24 to 114:9(1)), plaintiff has elected only to pursue damages based on the 45,000 seats and 5,500 logo ends mentioned in the November 5, 2009 purchase order.

for resale. Judge Kugler's Opinion held that plaintiff's letter
was a binding contract. Opinion at 13. As it turned out there
were 1,800 seats and 1,200 bleachers to be removed form Foley
Field. Tr. 82:23 to 83:11(1). Unlike CY, defendant contracted
to actually disassemble the seats at Foley Field. Tr. 84:9-
11(1). Under both contracts at issue, defendant was entitled to
keep all seating and logo ends that it removed for resale to
third parties. Stipulated Fact 7.

    As a matter of clarification, defendant did not agree to
actually disassemble the CY seats. As noted, plaintiff
subcontracted with Harriott to do this work. What defendant
agreed to do was pay for and cart away from CY the old seats
that had been disassembled and boxed up by Harriott. Per
plaintiff, "under the agreement, [Archer was] purchasing the
seats at the price specified, and they were required to remove
the seats. Once they were disassembled, put into containers
[Archer was] to remove [the seats] from the site." Tr. 30:1-
4(1).

    Although plaintiff and defendant only entered into one
contract for the CY seats, the work had to be performed in two
phases so that the work would not interfere with the Orioles
baseball season. Tr. 28:5-18(1). Phase 1, to be done in
2009/2010, involved all the lower bowl seats with the exception
of centerfield. Phase 2, to be done in 2010/2011, involved

centerfield and all of the upper bowl. Tr. 28:16-18(1); 38:17-20(1). Defendant performed Phase I of the CY contract and made a payment of $187,266.66 to plaintiff. Tr. 38:21 to 39:1(1); see also Exh. NNN. Plaintiff paid for 17,561 seats and 2,090 logo ends. Tr. 109:413(1); Exh. DDD. After the payment a balance of $295,233.34 remained on the contract. Tr. 40:2-4(1).

As early as April 19, 2010, defendant gave plaintiff every indication that it could no longer perform the CY contract. Exh. S. The reason defendant gave for why it could not complete the contract was that the market crashed and there was not a market for the used seats. Tr. 40:12-16(1). Defendant reiterated on several occasions it would not perform the remainder of the CY contract and the Foley Field contract. See June 2, 2010 email from defendant to plaintiff, Exh. S; June 4, 2010 email from Fritz Owen to B. Weener, Exh. V; June 6, 2010 email from defendant to plaintiff, Exh. W; July 14, 2010 email from defendant to plaintiff, Exh. AA ("I don't have the money to buy the seats…."); July 17, 2010 email from defendant to plaintiff, Exh. AA; August 19, 2010 email from defendant to plaintiff, Exh. EE ("[T]he money is not here to do anything anymore"); August 25, 2010 email from defendant to plaintiff, Exh. FF ("It ain't gonna' happen, we aren't able to take any seats or pay for any seats."). In the same email defendant informed plaintiff it would not remove the seats from Foley Field "for free." The

short answer to why defendant breached its contracts is because it "couldn't afford to buy them [seats]." Tr. 7:24(3).

On August 5, 2010, plaintiff advised defendant that the remaining removal at CY should start on October 18, 2010, Exh. GG. Plaintiff advised defendant on August 30, 2010, that it considered defendant to have repudiated the contract and that if defendant did not assure plaintiff that it would perform the contract, plaintiff would "proceed to exercise all of [its] rights and remedies" against defendant due to its breach. Exh. KK. At the time plaintiff was "panicking" because it did not have a way to handle the Phase 2 seats. Tr. 47:9-14(1). After the letter was sent defendant never gave plaintiff any indication that it changed its positon that it would not and could not complete the work it contracted to do.

Since Judge Kugler's ruling on plaintiff's motion for summary judgment decided that defendant breached its two contracts with plaintiff, it is left to this Court to decide whether plaintiff is entitled to damages and if so how much. Plaintiff seeks damages pursuant to 2-709 of the UCC, i.e., "Action for the Price." As an alternative, plaintiff seeks damages under 2-708. Plaintiff claims it is entitled to a damage award of $173,665.90. The Court will summarize plaintiff's calculation which will be discussed in more detail infra. Plaintiff claims it is entitled to $482,500 under the CY

agreement, plus the $6,200 that it paid to have the stadium seating removed from Foley Field. These two amounts total $488,700. From this total plaintiff deducted the following amounts: defendant's payment of $187,266.66, a $60,200.00 credit from plaintiff's sale of seats to the Madison Mallards, a $47,986.44 credit on account of the seats plaintiff sold to a facility in Sarasota, Florida,[3] and $19,581.00 plaintiff received from the sale of the remaining CY seats for salvage. Thus, in summary, plaintiff claims it is entitled to $173,665.90.

Defendant argues it did not "accept" the Phase 2 seats, that plaintiff did not act in a commercially reasonable manner to reduce its losses, and/or plaintiff failed to appropriately mitigate its damages, and that plaintiff did not "hold" the seats that defendant did not pay for. Defendant also argues that 6,000 of the seats at CY were not fit for their intended use because the cushions could not be removed properly and/or the bolts had seized tight and could not be removed. Defendant also argues that 4,000 of the CY seats were redirected seats which could not be easily sold. Defendant argues it did not contract to pay for these 10,000 seats that it could not use or re-sell. Tr. 20:16-25(1). Another way of saying this is that defendant argues that it only agreed to pay for the seats that it could use or re-sell.

---

[3] Sarasota County bought the seats for the Ed Smith Stadium. Tr. 121:19-21(1).

As to defendant's misdirected and "cushioned" seat argument, defendant ignores the fact that when Judge Kugler ruled on plaintiff's summary judgment motion he decided that these seats were not exempt from the parties' contract. Judge Kugler ruled that without exception defendant agreed to remove all the seats at CY. Opinion at 9 (holding that there was no genuine issue defendant "agreed to remove all existing seats…."). Further, even if this Court ruled on the issue independently of Judge Kugler's Opinion, it would rule the same way. The Court finds that defendant contracted to remove and pay for all the seats at CY even if the seats could not be re-sold. The Court rules this way for a number of reasons. First, the November 5, 2009 purchase order provided that defendant would remove all the seats at CY. Exh. K. No provision was made in the parties' contract to exclude redirected seats or "cushioned" seats. The existence of these seats was no secret to defendant. Defendant visited CY in 2004 and one time in 2009 before his contract with plaintiff. Tr. 173:5-13(1). Further, the Court finds that defendant had the opportunity to thoroughly inspect the CY seats before it entered the November 2009 contract. In addition, prior to the execution of the CY contract defendant knew it would be difficult to remove cushions from some seats. Exh. CCC. Also, the presence of redirected seats was open and obvious. Indeed, defendant testified he knew there were

thousands of redirected seats. Tr. 181:10-12(1); 29:15-17(3). Defendant's November 4, 2009 email even estimated the number of padded and redirected seats in CY. Exh. H. Thus, defendant knew or should have known that some of the seats that it removed at CY were not useable or sellable. If, as defendant argues, the parties intended to exclude unusable or unsellable seats from their contract, this would have been specifically mentioned. Further, although the parties' purchase order provided that 45,000 seats were to be removed, the quantities were subject to correction after a final tally of the removed seats was done. Exh. K. This further evidences that the parties knew how to exclude seats from their contract if they so intended.

Another reason defendant's argument as to the redirected and cushioned seats is rejected is because defendant acknowledged that it had to pay for seats that were not sellable. This is documented in Archer's November 2009 e-mail to Chuck Bailey, wherein Archer acknowledged he had to pay to remove some seats that he could not use. Exh. CCC; see also Defendant's November 16, 2009 email to plaintiff, Exh. I. Although Archer's testimony at trial contradicts these emails, the Court finds that the contemporaneous emails Archer sent in November 2009 are more credible than his trial testimony on this topic.

Although not clear, defendant is also apparently arguing that the parties' contract was contingent on the Orioles helping to market its old seats as memorabilia. Tr. 86:21-24(2). The Court rejects this argument. If this was a condition or material term in the parties' contract, it would have been specifically mentioned. There is no record in the parties' contract or their email communications that conditioned defendant's duty to perform on defendant receiving help from the Orioles to sell the used seats.

As to its commercial reasonableness or mitigation defense, defendant makes several arguments, including: (1) plaintiff did not act diligently to sell the Phase 2 CY seats after defendant notified plaintiff that it would not buy or remove any more seats, (2) plaintiff should have used its own sales force to try and sell the remaining seats at CY that defendant did not remove, (3) that the seats and benches at Foley Field could have been sold, (4) plaintiff should not have "trashed" any seats because they eventually could have been sold, and (5) plaintiff failed to give it required notice before plaintiff sold for salvage the CY and Foley Field seats it could not sell.

<u>CONCLUSIONS OF LAW</u>

As noted, Judge Kugler has already decided that defendant breached its contracts. In addition, the Court has noted that if it had to look at the issue independently it would rule the same

way as Judge Kugler. Thus, since it has been decided that defendant breached its contracts, the Court's role is to decide the amount of plaintiff's damages, if any. The parties agree that damages for the CY breach should be decided pursuant to the UCC. The parties also agree that the UCC does not apply to plaintiff's damage claim for Foley Field.

1.   <u>Plaintiff's Damage Claim</u>

Turning to plaintiff's damage claim, defendant attempts to make much of the fact that during the course of the case plaintiff submitted different damage estimates. Although the Court acknowledges this is the case, it is not determinative as to the amount of damages plaintiff may recover. The Court is only focusing on the damage claim plaintiff made at trial, not what plaintiff may have claimed earlier in the case. It is not insignificant that plaintiff and defendant do not materially disagree as to the relevant dollar figures. Instead, the parties' dispute how plaintiff's damages should be calculated and whether plaintiff satisfied the required elements in the UCC.

Plaintiff's damage calculation is as follows. <u>See</u> <u>generally</u> Exh. NNN. The contract price for CY totals $482,500. This is composed of $382,500 for the seats (45,000 x $8.50) plus $100,000 for the logo ends (5,500 x $18.18).[4] This leaves a

---

[4] The actual total is $99,990.

contract balance of $295,233.34. From the contract balance plaintiff gave defendant a credit for the amount defendant paid ($187,266.66) and the net income from the Madison Mallards and Sarasota sales.

As to Madison Mallards ("MM"), plaintiff sold 3,500 seats at a price of $26.00 per seat. This totaled $91,000. From this amount plaintiff deducted its incidental expenses which included a $6.50 charge per seat for removal, a $1.00 per seat charge for handling, a 5% administrative charge, and sales tax. After the incidental expenses were deducted from the sales price, plaintiff gave defendant a credit of $60,200 on the MM sale. As to Sarasota, plaintiff sold 7,078 seats and 1,100 standards and received $42,468. Plaintiff earned a profit of $5,518.44. Thus, plaintiff credited defendant $47,986.44 on the Sarasota sale. See generally Exh. NNN.

After the MM ($6,200) and Sarasota ($47,986.44) credits are deducted from the contract price ($295,233.34), a balance of $187,046.90 is left. As to the remaining seats at CY, plaintiff sold them for salvage and received $19,581. This amount was credited to defendant. As to Foley Field, plaintiff had to pay a third party to remove the seats. This cost plaintiff $6,200.

In sum, plaintiff's damage claim totals $173,665.90 and is calculated as follows:

                $482,500.00 (CY contract price)
              - 187,266.66 (amount defendant paid)

```
    -  60,200.00 (MM credit)
    -  47,986.44 (Sarasota credit)
    -  19,581.00 (CY scrap credit)
     167,465.90 (CY damages)
    +   6,200.00 (Foley Field removal cost)
     $173,665.90
```

2.  <u>Acceptance Under the UCC</u>

In order to decide what provision of the UCC applies to plaintiff's damage claim the Court will first address whether defendant accepted all the seats at CY.  Plaintiff says yes, defendant says no.  Plaintiff argues that since defendant accepted all seats, it can recover damages pursuant to 2-709. For the reasons to be discussed the Court agrees.

The applicable provision of the UCC defining when there has been an acceptance of goods is set forth in 2-606.  This provision reads:

(1) Acceptance of goods occurs when the buyer

    (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

    (b) fails to make an effective rejection (subsection (1) of 12A:2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

    (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

(2) Acceptance of a part of any commercial unit is acceptance of that entire unit.

In order for there to be an "acceptance" there must be an unequivocal act with intent to possess the goods as an owner. Massari v. Accurate Bushing Co., 8 N.J. 299, 264 (1951); see also Mobilificio San Giacomo S.p.A. v. Stoffi, C.A. No. 96-415-SLR, 1998 WL 125536, at *6 (D. Del Jan 29, 1998)("[T]o constitute acceptance there must be an acceptance by some unequivocal act with intent to take possession of the goods as owner. This question is one of fact. It depends upon the circumstances of the particular case."). Plaintiff argues defendant accepted within the meaning of the UCC all of the seats at CY. Although defendant acknowledges it accepted the Phase 1 seats, it denies that it accepted the Phase 2 seats. Defendant relies on the fact that it let plaintiff know as early as April 2010, before the Phase 2 removal started, that he did not have the money to pay for the seats and he would not remove them. The Court rejects defendant's argument and finds that defendant accepted all of the seats at CY.

Before a buyer can be held to have accepted goods, the buyer must be given a reasonable opportunity to inspect the goods. Jakowski v. Carole Chevrolet, Inc., 180 N.J. Super. 122, 126 (L. Div. 1981)(citing N.J.S.A. 12A:2-606). There is no question that before the CY project started defendant had a reasonable opportunity to inspect all of the seats at CY. Even if the Court credits Archer's claim that he did not visit CY to

inspect all the seats he contracted to buy and remove, nothing prevented him from visiting the site and scrupulously inspecting the seats. Further, in November 2009, defendant sent an email to plaintiff acknowledging that he visited CY and "checked [the seats] closely." Exh. CCC. Archer's trial testimony is inconsistent with the contemporaneous documentary evidence. The Court credits the statement in defendant's November 2009 email.

Under the UCC possession does not mean "acceptance." Zabriskie Chevrolet, Inc. v. Smith, 99 N.J. Super. 441, 455 (L. Div. 1968). Thus, defendant did not have to physically possess the Phase 2 seats to be deemed to "accept" the seats. In addition, defendant's payment to the plaintiff for all the CY seats was not a prerequisite to acceptance. If defendant wanted to reserve the right not to perform Phase 2 this would have and should have been stated in the parties' contract. The Court finds that since defendant visited CY and inspected the seats, and thereafter contracted to remove all of the seats at CY, and in fact removed and paid for approximately 17,000 seats, defendant accepted all of the CY seats. Defendant's actions signified his unequivocal acceptance of all of the seats at CY.

Defendant makes much of the fact that the work at CY was to be done in two phases and that as early as April 2010 he told plaintiff he would not perform Phase 2. However, the fact that defendant repudiated Phase 2 and revoked his prior acceptance

does not take away from the fact that earlier on he accepted all the seats at CY. Defendant confuses the concepts of acceptance and repudiation. It is true that defendant repudiated Phase 2. However, this does not take away from the fact that prior thereto defendant accepted all of the seats at CY.

Section 2-606 of the UCC provides, "[a]cceptance of a part of any commercial unit is acceptance of that entire unit." See Rocheux Intern. of N.J., Inc. v. U.S. Merchants Financial Group, Inc., 741 F. Supp. 2d 651, 669 (D.N.J. 2010). The Court finds that there was a single commercial unit of goods at CY, i.e., all the seats in the stadium. See N.J.S.A. §12A:2-105(6). Defendant's acceptance of a substantial portion of the unit served to accept the entire unit. See 2-606(2). Defendant acknowledges that it accepted and paid for 17,561 Phase 1 seats and 2,090 logo ends. Tr. 109:4-13(1). Since defendant admittedly accepted a substantial portion of the seats at CY, the Court finds that this evidences his acceptance of all seats. The fact that the seat removal was to be done in two phases is immaterial to the fact that after defendant accepted a substantial portion of the CY seats it accepted all the seats. It is illogical for defendant to argue that even though it accepted and paid for approximately 17,000 seats it did not accept the remaining seats simply because he could not afford to pay for them.

3.   <u>Section 2-709 Contract Price Damages</u>

The remedies plaintiff may seek because of defendant's revocation of its acceptance and repudiation of Phase 2 of the CY contract are listed in 2-703. Plaintiff's remedies include, <u>inter alia</u>, the right to resell and recover damages under 2-706, to recover damages for non-acceptance under 2-708, or to recover for the contact price under 2-709. Generally, the UCC's remedies are to be "liberally administered to the end that the aggrieved party may be put in as good as a position as if the other party had fully performed." <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 148 N.J. 396, 426 (1997)(citing N.J.S.A. 12A:1-305).

Defendant is proceeding under 2-709 and seeks to recover the contract price.  This provision of the UCC reads:

(1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price

(a) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and

(b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.

(2) Where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale becomes possible he may resell them at any time prior to the collection of the judgment.  The net proceeds of any such resale must be credited to the

buyer and payment of the judgment entitles him to any goods not resold.

(3) After the buyer has wrongfully rejected or revoked acceptance of the goods or has failed to make a payment due or has repudiated (12A:2-610), a seller who is held not entitled to the price under this section shall nevertheless be awarded damages for non-acceptance under the preceding section.

Pursuant to 2-709, plaintiff may recover incidental damages as defined in 2-710. Mack Boring & Parts Co. v. Novis Marin, LTD, C.A. No. 06-2692 (HAA), 2008 WL 4371769, at *8 (D.N.J. Sept. 18, 2008); Atlantic Aviation Corp. v. Provident Life & Acc. Ins. Co., C.A. No. 86-533-CMW, 1989 WL 101469, at *6 (D. Del. Aug. 2, 1989).

As discussed, the Court has found that defendant accepted all of the seats at CY. In addition, the Court finds that plaintiff sold in a commercially reasonable manner all the seats at CY that remained after defendant failed to perform. This includes the seats plaintiff sold for salvage. In addition, even if the seats sold for salvage were not done in a commercially reasonable manner, plaintiff was unable, after reasonable effort, to resell the seats at a reasonable price. The Court also finds that the circumstances reasonably indicated to plaintiff that any further efforts to resell the seats were unavailing. In short, the Court finds that at all relevant times plaintiff acted in a commercially reasonable manner. This includes the fact that plaintiff acted reasonably to mitigate

its damages. Defendant's contrary arguments rely on unreasonably optimistic predictions and unrealistic expectations. Defendant engages in non-productive and non-persuasive "Monday morning quarterbacking." A good example of this is defendant's contention that if defendant paid to transport and store the Phase 2 CY seats it could have reaped hundreds of thousands of dollars in sales. To the contrary, as discussed herein, there was no market for the seats. Given the market conditions, as evidenced by defendant's failure to even sell the lesser quantity of Phase 1 seats, and the fact that some of plaintiff's Phase 1 seats are still sitting in a warehouse (Tr. 27:9 to 29:11(2)), it is likely that if defendant held the Phase 2 seats for plaintiff that tens of thousands of unsellable seats would now be collecting dust in a warehouse.[5] Indeed, plaintiff has made a persuasive demonstration that to date defendant has at most sold only 2,000 seats. Tr. 28:1-3(2).

Defendant argues plaintiff did not exercise reasonable or diligent efforts to sell the seats that defendant repudiated. Stated another way, defendant argues plaintiff did not act in a commercially reasonable manner to mitigate its damages. The Court disagrees. Contrary to defendant's argument, the Court finds that plaintiff engaged in commercially reasonable efforts to sell the seats. See Tr. 48:1-13(1), 52:20 to 53:16(1). These

---

[5] Even giving defendant the benefit of the doubt, at least 20,737 seats would still be remaining. Tr. 133:10-12(1).

efforts were above and beyond the sales to MM and Sarasota. Furthermore, defendant ignores the fact that plaintiff was not in the business of selling used seats but instead sold new seats. Thus, plaintiff could not be expected to have the same wherewithal that defendant had to sell used seats. Moreover, defendant is hard pressed to argue plaintiff should have sold the Phase 2 seats when defendant himself found it impossible to sell the seats. In addition, defendant ignores the time pressures plaintiff faced to remove the Phase 2 seats so that the work at CY could be completed in time for the next baseball season. Tr. 50:25-51:8(1). Similarly, something had to be done quickly at Foley Field because of the contractor's immediate need to proceed with its work.  Tr. 121:2-6(1).

Defendant argues that plaintiff should have "worked with him" to store the seats until they could be sold. If this occurred, defendant argues, plaintiff did not have to sell the remaining seats for salvage. The Court finds that plaintiff was justified in rejecting defendant's proposal. Defendant's proposal was contingent on plaintiff paying for the transportation and/or storage of the seats. Since defendant did not have the money to pay for storage. Tr. 32:4-7(2), Exh. W; see also Tr. 49:8-14(2). Having just breached its contract to pay for the removal of the Phase 2 CY seats, and knowing that defendant's business was in deep financial trouble (Tr. 35:19 to

22

36:10(2)), it was not unreasonable for plaintiff to reject defendant's proposal to continue to work together, especially since defendant wanted plaintiff to pay the cost of storing the CY seats. Tr. 121:12 to 122:14(2). It was commercially reasonable for plaintiff not to want to do business with a company that told it "the money is not here to do anything anymore." Exh. EE. This is especially true since defendant could not give any assurances when the seats would eventually be sold and how long storage or other associated "carrying costs" and incidental expenses would continue. And, last but not least, plaintiff simply was not in the business of selling used seats. As noted in <u>Covino v. Peck</u>, 233 N.J. Super. 612, 619 (App. Div. 1989)(citation and quotation omitted), "[a]n injured party should not be required to lay out money, as defendant's approach would require, upon a questionable assumption that one day its work will be recaptured."

As discussed, defendant argues it was commercially unreasonable for plaintiff to sell the leftover CY seats for salvage after defendant breached its contract. The Court disagrees. The Court first notes there is authority to the effect that 2-709(2) does not require that a resale be "commercially reasonable." <u>Hidden Brook Air, Inc. v. Thabet Aviation Intern, Inc.</u>, 241 F. Supp. 2d 246, 275 (S.D.N.Y. 2002). Nevertheless, even if plaintiff is held to a commercial

23

reasonableness standard, the Court finds that this standard was met. It must be kept in mind that plaintiff was in a time bind because it had to remove the seats from CY in order to complete the work at the stadium. Tr. 121:2-6(1). Further, the seats could not be sold because there was no market for them. Tr. 78:7-13(1); 146:18 to 148:4(1). This is aptly demonstrated by the fact that defendant did not present plaintiff with any opportunities other than MM and Sarasota. Tr. 148:1-6(1). Storing the enormous quantity of leftover seats was not a viable option because of space and cost considerations. Tr. 80:15 to 81:8(1). Although the exact number of seats leftover has not been computed, the number likely exceeds 20,000. Tr. 133:10-11(1). The only viable option for plaintiff was to sell the remaining seats for scrap or salvage and credit defendant the price. Tr. 77:21 to 78:6(1). Plaintiff worked diligently to get the best price that it could. Tr. 79:6 to 80:7(1). The reasonableness of plaintiff's actions is further demonstrated by the fact that it held the seats as long as it could. Tr. 50:14 to 51:22(1); see also Exh. HHH. Facing the choice of having to pay thousands of dollars to transport and store thousands of used seats for an indefinite time into the future, or saving these costs and earning some money by selling the seats for salvage, plaintiff made the commercially reasonable choice to sell the seats for salvage. Time has borne this out as evidenced

by the fact that defendant still is storing Phase 1 CY seats and associated hardware.

Section 2-709 rather than 2-708 is also the proper measure of damages because no market existed for the CY seats and resale was not possible or practical.  See Rheinberg Kellerei GmbH v. Brooksfield Nat. Bank of Commerce Bank, 901 F.2d 481, 484-85 (5th Cir. 1990)(Section 2-708 is inapposite where there is no market rate for the goods at issue.  In such an instance damages should be computed under 2-709); Uniform Commercial Code (West 6th ed.), Practitioner Treatise Series Vol.1, §8:13 at 686 ("If no market exists for the product with which to measure damages, an action for the price under 2-709 (or in some case for lost profits under 2-708(2) rather than an action under 2-708(1)) is appropriate"); Indeck Energy Services, Inc. v. NRG Energy, Inc., No. 03C2265, 2004 WL 2095554, at *12 (N.D. Ill. Sept. 16, 2004)(where efforts to sell goods are unavailing "courts routinely apply section 709(1)(b) and measure damages by the contract price").

As is evident from the foregoing discussion, the Court finds that plaintiff satisfied the criteria in 2-709(1). Defendant argues plaintiff did not satisfy the requirements in 2-709(2) because it did not "hold" the Phase 2 seats before it sold them for salvage. Recognizing that the UCC is liberally administrated and is designed to put an aggrieved party like

plaintiff in as good a positon as if the other party had fully performed (1-305), the Court rejects this argument for a number of reasons. First, the seats that defendant argues were scrapped were actually sold for salvage. The Court has already ruled this was done in a commercially reasonable manner. Thus, there were no seats left to hold for defendant. Second, even if the "salvage sale" does not qualify as a sale of the Phase 2 seats within the meaning of the UCC, it would have been fruitless for defendant to hold onto the seats. There was no market for the seats and they could not be sold. Defendant acknowledged the market for the seats "evaporated." Tr. 31:17 to 32:11(3); Exh. W. Therefore, if the seats were held it would merely result in a useless act that unnecessarily increased plaintiff's carrying costs and incidental expenses. In turn, this would have increased the damages defendant would have to pay in this lawsuit.

Defendant's argument that plaintiff was required to give it notice before the "salvage" sale at CY and Foley Field is also rejected. The purpose of giving reasonable notification of an intent to resell is to allow a party to protect his interests by taking part in the sale or other dispensation if it so desires. McLaughlin v. Khiel, No. CV-00-56, 2001 WL 1719225, at *2 (Sup. Ct. of Maine 2001). The foregoing discussion summarizes in detail the incessant efforts plaintiff made to convince

defendant to perform under his contracts. These efforts made plaintiff's intent to resell manifestly evident. The foregoing discussion also evidences defendant's steadfast insistence that it would not and could not perform under the contract. On August 30, 2010 (Exh. KK), defendant advised plaintiff that it had a last chance to perform its contract. In defendant's words he threw plaintiff's entreaties in the trash. Tr. 45:6-18(2). Any further notice to defendant after August 30, 2010, of what plaintiff was going to do with the leftover seats was a waste of time. This is aptly demonstrated by the fact that defendant told plaintiff on June 6, 2010 that even if the Phase 2 seats were free he would not take them. Tr. 139:23 to 140:1(1). Plaintiff gave defendant a "last notice." Any further notice to defendant was manifestly unnecessary. It is too late for plaintiff to now complain that he should have been given another chance to buy the Phase 2 CY seats before they were resold.

4.   <u>CY Damage Computation Under 2-709</u>

Having decided that plaintiff satisfied the criteria in 2-709 to recover damages, the Court will calculate the amount. Except for several items the Court agrees with plaintiff's damage calculation. Plaintiff's calculation of the contract price for CY is correct. Plaintiff's calculation of the credits and its incidental expenses for the MM sale of 3500 seats needs

27

to be adjusted.[6] The Court finds that plaintiff did not appropriately document the 5% administrative charge as an incidental expense. Tr. 56:1-13(1). The 5% translates to $4,550. The Court also finds that plaintiff's $6.50 per seat charge for seat removal on the MM sale was not appropriate. Plaintiff had to pay this amount to Harriott whether or not defendant breached the contract. Tr. 153:17 to 154:3(1). This adjustment results in an extra credit to defendant of $22,750 (3,400 x $6.50). The Court will allow Harriott's $1.00 charge as an incremental cost since this is what plaintiff paid to ship the seats to the MM. Tr. 55:19-23(1). The sales tax charge will not be disallowed. Thus, the credit defendant should get for the MM sale is $91,000 - $3,500 -4,744 = $82,756.

Thus, plaintiff's 2-709 damages for the CY breach is calculated as follows:

```
      $482,500.00 (CY contract price)
     - 187,266.66 (amount defendant paid)
     -  82,756.00 (MM credit)
     -  47,986.44 (Sarasota credit)
     -  19,581.00 (CY scrap credit)
      $144,909.90
```

5.   Section 2-708 Damages

Even if the Court agreed with defendant that plaintiff may not recover damages under 2-709, plaintiff can still recover the

---

[6] Incidental expenses are recoverable under 2-709. They include any commercially reasonable charges or expenses incurred in connection with the return or resale of goods or otherwise resulting from a contract breach. See 2-270. Incidental damages include prejudgment interest. Entron, Inc. v. Affiliated FM Ins. Co., 749 F.2d 127, 131-132 (2nd Cir. 1984).

same amount of claimed damages under 2-708, _i.e._, its lost profit. The Court must look to the profit calculation under 2-708(2) because, as noted, no market existed for the Phase 2 seats making the remedy under 2-708(1) inapplicable. See In re S.N.A. Nut Co., 247 B.R. 7 (Bkrtcy. N.D. Ill. 2000)(when there is no readily accessible market from which to determine market price, 2-708(2) rather than 2-708(1) should be examined). As already discussed, the sale of seats to defendant was not a typical sale of goods. Since plaintiff did not incur any costs to make or procure the seats, every dollar it earned from the sale to defendant was profit. In other words, the contract price was the same as plaintiff's profit. Thus, the same damage calculation under 2-709 applies to 2-708. For this reason, plaintiff is entitled to an award of $144,909.90 for CY damages whether plaintiff's damages are calculated under 2-708 or 2-709.

6.   Foley Field Damage Computation

Plaintiff's damage claim for the breach of the Foley Field contract is straightforward. If made, defendant's argument that it was commercially unreasonable to pay $6,200 to remove the Foley Field benches is rejected. Again, plaintiff was in a time crunch and had to do something with the seats. Defendant is hard pressed to argue that the $6,200 plaintiff paid was too high when he offered to do the removal work for $24,000. Tr.

146:10-17(1).   Further, Archer admitted it was not unreasonable
to pay $2.00 to remove the Foley Field seats. Tr. 172:1-3(1).

Under the common law a party who breaches a contract is
liable for all of the natural and probable consequences of the
breach of that contract. <u>Sons of Thunder</u>, 148 N.J. at 427
(citation omitted). Plaintiff had to pay $6,200 to remove the
Foley Field seats. Defendant acknowledges this charge was
reasonable and in fact was substantially less than plaintiff's
estimate to do the same work. Therefore, plaintiff may recover
$6,200 for defendant's breach of the Foley Field contract.

7.   <u>Pre-Judgment Interest</u>

The trial court has the discretion to grant or deny
prejudgment interest. It is settled that prejudgment interest
may be awarded on contract claims even where the debt is for an
unliquidated damage claim. <u>Meshinsky v. Nichols Yacht Sales,
Inc.</u>, 110 N.J. 464, 478 (1988).  The decision in <u>Izzo v. Izzo</u>,
C.A. No. A-2335-06T2, 2008 WL 482406, at *9-10 (App. Div. Feb.
20, 2008)(citation and quotation omitted), noted:

> In awarding prejudgment interest, "[t]he basic
> consideration is that the defendant has had the use,
> and the plaintiff has not, of the amount in question;
> and the interest factor simply covers the value of the
> sum awarded for the prejudgment period during which
> the defendant had the benefit of monies to which the
> plaintiff is found to have been earlier entitled.

It is also within the trial court's discretion to choose the
date on which prejudgment interest will begin to run on the

basis of equitable principles. The trial judge should set forth the particular point from which prejudgment interest is calculated. Id. at *10. The Court finds that prejudgment interest is warranted by considerations of justice and fair dealing. The Court believes it has always been clear, as evidenced by Judge Kugler's summary judgment decision, that defendant breached its contracts. It is unfair that plaintiff has been denied the benefit of its contracts due to defendant's breach. The Court finds that the appropriate date for the award of interest to start running is January 5, 2011, the date plaintiff filed its complaint.

CONCLUSION

In conclusion, the Court will enter a judgment in plaintiff's favor in the amount of $151,109.90, plus prejudgment interest running from January 5, 2011. Since it has already been determined that defendant breached its contracts, the Court's role was to determine if plaintiff is entitled to damages and if so how much. With regard to CY, plaintiff is entitled to damages pursuant to 2-709, i.e., the contract price. The Court finds that defendant accepted within the meaning of 2-606 of the UCC all of the CY seats. As such, plaintiff is entitled to an award of the contract price plus incidental expenses, minus payments already made and the money plaintiff received from the sale of the seats. Plaintiff satisfied the "hold" requirement in 2-

31

709(2). The price under the CY contract was $482,500. When the payment ($187,266) and seat sale credits ($150,323.44) are deducted from the price of the CY contract, the resulting damage award for the CY breach is $144,909.90. Further, the Court finds that even if the Court ruled that plaintiff is not entitled to damages under 2-709, plaintiff is entitled to the same amount of damages under 2-708.

For the reasons discussed in detail, the Court rejects defendant's argument that plaintiff did not act in a commercially reasonable manner to reduce or mitigate its damages. Plaintiff was not in the business of selling used seats. The fact that there was more the plaintiff could have done did not render its actions commercially unreasonable. Although plaintiff may not have acted perfectly, it acted responsibly and reasonably under the circumstances. Defendant repeatedly second guesses plaintiff's mitigation efforts but it fails to recognize that the reason the lawsuit was filed is because defendant could not sell the seats it contracted to pay for and remove. Defendant is hard pressed to argue plaintiff should have sold the seats when he could not sell the seats himself.

Defendant's "Monday morning quarterbacking" is not persuasive. It certainly would have been nice if defendant or plaintiff could have sold the seats at a tidy profit. However,

given the prevailing economic conditions and uniqueness of the seats at issue, this was not in the cards. Further, it would have been unreasonable for plaintiff to hold onto or to store the unsold CY or Foley Field seats. This would have resulted in the incurrence of higher "carrying costs" and incidental expenses to plaintiff with absolutely no assurance of how long it would have to continue to store unsellable used stadium seats. The fact that defendant still has some unsold seats evidences that it is fanciful for defendant to think that plaintiff could have sold the CY seats for a profit.

　　As to Foley Field, the analysis is more straightforward. Since defendant did not remove the seats and benches at no cost as he contracted to do, defendant is liable for the cost plaintiff had to pay to remove the seats and benches. This amount is $6,200.

　　Accordingly, for all the foregoing reasons, the Court finds that defendant is liable to plaintiff in the amount of $144,909.90, for breaching its CY contract. Plaintiff is liable to plaintiff for $6,200 for breaching the Foley Field contract. A Judgment in the amount of $151,109.90, plus prejudgment interest running from January 5, 2011, will be entered against defendant.

　　　　　　　　　　　　　　　s/Joel Schneider
　　　　　　　　　　　　　　　JOEL SCHNEIDER
　　　　　　　　　　　　　　　United States Magistrate Judge

Dated:   September 26, 2014